# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 05-CV-1585 (JFB)
_____

DANNY FREEMAN,

Petitioner,

VERSUS

SUPERINTENDENT JOHN BURGE,

Respondent.

_____

**MEMORANDUM AND ORDER**
May 22, 2009
_____

JOSEPH F. BIANCO, District Judge:

Danny Freeman ("Freeman" or "petitioner") petitions the Court *pro se* for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 (the "petition"), challenging his conviction and sentence in the County Court of the State of New York, Nassau County (the "trial court").

On June 15, 1998, following a jury trial, Freeman was convicted of murder in the second degree, attempted robbery in the first degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree, in connection with the death of Charlie Walker ("Walker") on November 9, 1996 in Lakeview, New York. On July 21, 1998, the trial court sentenced petitioner to an indeterminate term of 25 years to life on the murder conviction, and an indeterminate term of 7½ to 15 years on the convictions for attempted robbery and criminal possession of a weapon in the second degree. Although these sentences were to run concurrently, the trial court also sentenced Freeman to a consecutive, indeterminate term of imprisonment of 2½ to 5 years on the conviction for criminal possession of a weapon in the third degree.

In his initial petition, Freeman argues that (1) he was denied the effective assistance of counsel because his trial attorney failed to object to hearsay testimony provided by four prosecution witnesses; and (2) the trial court erred by ordering petitioner's sentence for criminal possession of a weapon in the third

degree to run consecutively to his other sentences. As set forth *infra*, Freeman's reply brief raised additional grounds in support of the petition – namely, ineffective assistance of appellate counsel. After this action was stayed and this claim was subsequently exhausted by petitioner, the Court deemed the petition to be amended to add that claim and gave both sides an opportunity to brief the ineffective assistance of appellate counsel claim.

For the reasons set forth below, the Court denies the petition in its entirety. In particular, the first two claims – namely, the ineffective assistance of trial counsel claim and the sentencing claim – are procedurally defaulted and, in any event, fail on the merits. The third claim, asserting ineffective assistance of appellate counsel, also fails on the merits.

## I. FACTS

Based upon a review of the petition and underlying record, the Court has set forth below a summary of the evidence presented at petitioner's trial.

### A. The Events of November 9, 1996

#### (1) Background

As of November 1996, Leonard Thames ("Thames") was dealing drugs on behalf of Gregory Booker ("Booker"), a resident of Lakeview, New York. (Trial Transcript ("T.") 799.)

In early November 1996, Thames informed Booker that Walker was "constantly" robbing Thames. (T.801.) Two or three days later, Booker spoke to Walker and informed him of Thames's accusation.

(T.803.) In response, Walker stated that he was going to confront Thames. (T.803.)

#### (2) Initial Altercation at Joe's Deli

At approximately seven-thirty in the evening of November 9, 1996, at an establishment called Joe's Deli, Booker witnessed a physical altercation between Walker and Thames. (T.803-05.) Booker observed that, after the altercation, Thames's face was bruised. (T.806.) Booker brought Thames to Booker's home to wash Thames's face, and told Thames to forget about the fight with Walker. (T.806.) However, Thames told Booker that Thames was going to shoot and kill Walker that night. (T.806-07.)[1]

#### (2) Thames Meets Teejuana Young

Later in the evening, Thames's girlfriend, Teejuana Young ("Young"),[2] met Thames at his home for the purpose of watching a boxing match. (T.913-14.) She observed cuts and blood on Thames's face. (T.915.) Thames informed Young that he had been in a fight with Walker. (T.915.)

#### (3) Thames Picks Up Petitioner

Thames subsequently directed Young to drive him to a certain store near Flatbush Avenue. (T.917-18.) When Thames and Young reached the store, they observed

---

[1] Specifically, Thames used certain slang terms that Booker understood to mean that Thames planned to shoot and kill Walker that night. (T.806-07.)

[2] Young was also known as "Tiny."

petitioner.[3]  (T.918.)  Petitioner approached the car and asked Thames about the condition of his face.  (T.918.)  Thames informed petitioner that a man had robbed and beaten him.  (T.918.)  Petitioner got into the car.  (T.919.)

While Young, Thames, and Freeman were driving in the car, Thames and petitioner discussed Thames's fight with Walker.  (T.925.)  Freeman stated that he was going to help Thames get his money back from Walker by "jumping" Walker with Thames.  (T.926.)

(4) Thames Encounters Sean McKenzie

During the car ride, Young, Thames, and Freeman saw Sean McKenzie ("McKenzie") on the side of the road.  (T.923.)  Young knew McKenzie from school, and McKenzie and Thames had also been acquainted for a couple of years.  (T.836, 923.)  Thames asked Young to pull over, and Thames got out of the car.  (T.841, 923.)

Thames asked McKenzie whether he had seen Walker, whom McKenzie had also known for a couple of years.  (T.837, 841.)  When McKenzie said that he had not seen Walker, Thames informed McKenzie that he intended to kill Walker.  (T.841.)  Thames, Young, and petitioner continued driving.  (T.842.)

(5) Reginald McMillian Encounters Walker

At approximately midnight, Reginald McMillian ("McMillian") was making a phone call near Woodfield Road in Lakeview.  (T.858.)  Walker called out to McMillian from

Walker's bicycle, and McMillian and Walker began speaking.  (T.860-61.)  A car pulled up to McMillian and Walker, and McMillian said to Walker: "[W]hose [sic] this pulling up, like they are gangsters or something."  (T.861.)

McMillian and Walker started walking away.  (T.862.)  McMillian asked Walker whether he knew the people in the car, and Walker "didn't say nothing.  He stood there with his mouth open and looking."  (T.862.)

McMillian observed two men get out of the car.  (T.863.)  McMillian walked away and, as he did so, observed Thames, Freeman, and Walker speaking.  (T.905.)

(6) Walker is Killed

As Young observed McMillian walking away from Thames, Freeman, and Walker, she simultaneously saw Freeman "patting [Walker's] pockets."  (T.930.)  She was focusing on McMillian when she heard a gunshot.  (T.931.)  She then observed Thames and Freeman walking toward the car.  (T.932.)  They instructed her to drive away.  (T.932.)  At trial, Young described the dialogue that subsequently took place in the car:

> A: I heard Baby say, he saw blood.  Coming from Charlie head.  And I heard Leonard say, that it looks like Charlie was going to grab him.  Grab you and get the gun, to Baby.
>
> Q: Lenny said it looked like Charles was going to grab you and what?
>
> A: Get the gun.

---

[3] Young knew petitioner as Thames's "cousin" or by the nickname "Baby."  (T.918.)  Thames and Freeman were not actually related by blood.

3

(T.932-33.) Young dropped petitioner and Thames off at their respective homes. (T.933.)

### B. Freeman's Confession

As set forth below, petitioner confessed – in writing – to the attempted robbery and murder of Walker.[4] In particular, petitioner confessed the following:

> Back on November 9th . . . I was out on the corner and I was going to watch the fight with my – at my friend's house, when I saw Lenny and his girlfriend Tiny pull up . . . . I walked over to the car window and Lenny says, yo, son, I need you. I need you to get me a gun. A guy robbed me and beat me . . . . I walked away and went into the store to see my cousin Eddie. I asked him for a gun and he gave me one . . . . I got in her two door car and I sat in the back seat.

> \*\*\*

> As we drove Lenny was talking about getting his money back from this guy that robbed him and beat him. We were going to jump this guy when we saw him.

> \*\*\*

> After that, we started to drive, and as we went down some street, Lenny told me, there he is. I looked over to my left and saw two guys standing on the sidewalk. One guy on his bike . . . . Then this other guy who was with the guy on the bike stepped off . . . . I was then out of the car and crossed over and stood next to Lenny . . . . Lenny pulls out the gun in his coat, and points it at this guy. They are saying things back and forth to each other. But I don't remember the words that they are saying. I said to Lenny, that him? And Lenny said, yeah. I was stepping up to pat this guy down and check his pants pocket to get Lenny's money back. I didn't want to get real close to this guy without a gun. So I reached over and got the gun from Lenny. I had the gun in my right-hand and I am using my left hand to check his pockets . . . . After a pause, I stopped patting him. He kind of jumped at me. Reaching his hands out toward me. I stepped back with the gun still in my right-hand. He was kind of leaning forward over the front of the bike, and the gun went off.[5] I think I

<hr/>

[4] Petitioner testified at trial and, among other things, disputed both the substance of, and circumstances surrounding, the confession.

[5] Walker was shot with a nine millimeter gun, and the police retrieved a nine millimeter cartridge casing from the crime scene. (T.1262.) Later, the police recovered twelve gun cartridges from Freeman's dresser at his home, including a nine millimeter cartridge manufactured by the same

saw blood coming from his head. Some of the blood squirted on my sneakers.[6] I then turned and ran towards the car.

(T.1030-34.)[7]

## II. PROCEDURAL HISTORY

### A. Background

On June 15, 1998, following a jury trial, Freeman was convicted of murder in the second degree, attempted robbery in the first degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree. On July 21, 1998, the trial court sentenced petitioner to an indeterminate term of 25 years to life on the murder conviction, and an indeterminate term of 7½ to 15 years on the convictions for attempted robbery and criminal possession of a weapon in the second degree. Although these sentences were to run concurrently, the trial court also sentenced Freeman to a consecutive, indeterminate term of imprisonment of 2½ to 5 years on the conviction for criminal possession of a weapon in the third degree.

### B. Initial Appellate Procedures in New York State Court

#### (1) Ineffective Assistance of Trial Counsel Claim

On May 7, 2001, petitioner appealed his conviction to the Appellate Division on the grounds that he was ineffectively represented by trial counsel. Although petitioner – represented by appellate counsel – argued primarily that trial counsel had improperly failed to object to various hearsay evidence, petitioner also argued that trial counsel's voir dire, opening and closing statements, cross-examination tactics, and motion practice were inadequate.[8] (Respondent's Exh. 1.)

On July 8, 2002, the Appellate Division affirmed Freeman's conviction. Specifically, the court held:

---

company that manufactured the cartridge casing found at the crime scene. (T.1263-68.)

[6] A forensic expert for the prosecution found a substance that may have been blood on the jeans petitioner was wearing on the night of Walker's murder, as well as on petitioner's sneakers. (T.1206-09.) However, DNA testing was unable to verify whether the substance was Walker's blood, or even whether it was human blood. (T.1233, 1237-38.)

[7] At trial, Nassau County Police Detective Martin Alger ("Alger") explained that his fellow detective, Detective Vincent Donnelly ("Donnelly"), obtained Freeman's written confession by asking petitioner questions and writing down the responses. (T.1027-28.) The Court is aware of petitioner's argument at trial that he was, essentially, deceived into signing the confession. However, Freeman has not raised the legality of his confession in the petition or in any of his other papers submitted to the Court. In any event, the Court has carefully reviewed the entire record in this case and finds that it contains no evidence of any unconstitutional conduct by the police in obtaining the confession.

---

[8] Although Freeman was represented by appellate counsel, he also made a *pro se* submission in support of this appeal, arguing that trial counsel's failure to request that the jury be instructed to determine (1) whether Young was an accomplice to the crime and, if so, (2) that her testimony had to be corroborated pursuant to C.P.L. § 60.22, deprived petitioner of his constitutional right to effective counsel. (*See* Respondent's Exh. 2.)

The defendant was not denied the effective assistance of counsel. Where, as here, "the evidence, the law, and the circumstances of [the] case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation," the constitutional requirement of effective assistance of counsel is satisfied.

The defendant's remaining contentions, including those raised in his supplemental pro se brief, are without merit.

*People v. Freeman*, 744 N.Y.S.2d 719, 720 (N.Y. App. Div. 2002) (citation omitted) (the "July 2002 Order").

By letter dated November 26, 2002, and while he was still represented by counsel, Freeman requested that the Court of Appeals grant him leave to appeal the decision of the Appellate Division. (Respondent's Exh. 6.) In particular, Freeman requested leave to appeal on the grounds that his confession was obtained illegally. (*Id.*) He argued that the police deprived petitioner of his right to counsel prior to the confession. (*Id.*) Petitioner also referred to his counsel's "change in strategy" during the trial. (*Id.*) Freeman had not explicitly raised either of these claims before the Appellate Division. On May 13, 2003, the Court of Appeals denied petitioner's request for leave to appeal. *People v. Freeman*, 100 N.Y.2d 538, 538 (N.Y. 2003). Petitioner then sought a writ of certiorari from the United States Supreme Court, which was denied on January 26, 2004.

*Freeman v. New York*, 540 U.S. 1166, 1166 (2004).

(2) Objection to Sentence

On September 3, 2004, pursuant to C.P.L. § 440.20, Freeman moved the trial court *pro se* to set aside his sentence on the grounds that the trial court improperly imposed a consecutive sentence on his conviction for criminal possession of a weapon in the third degree. (Respondent's Exh. 8.) On January 11, 2005, the trial court denied the motion. (Respondent's Exh. 10.) On February 28, 2005, Freeman mailed to the Nassau County District Attorney's Office a document labeled "Notice of Entry," stating that he was appealing the denial of his § 440.20 motion to the Appellate Division. (Respondent's Exh. 11.) However, the Appellate Division has no record of receiving from petitioner such an application. (*See* Respondent's Aff. in Opposition ¶ 14.)

C. Initial Proceedings Before This Court

On March 23, 2005, Freeman filed the instant petition, which was originally assigned to United States District Judge Sandra J. Feuerstein. Petitioner filed the petition *pro se*, and has continued to represent himself in the proceedings described below.

In particular, as described *supra*, Freeman argues in the initial petition that (1) he was denied the effective assistance of counsel, because his trial attorney failed to object to hearsay testimony provided by four prosecution witnesses (the "hearsay issue"); and (2) the trial court erred by ordering petitioner's sentence for criminal possession of a weapon in the third degree to run consecutively to his other sentences.

6

On June 15, 2005, respondent filed his opposition. Specifically, in addition to arguing that the petition failed on the merits, respondent argued that the Court was procedurally barred from reviewing (1) Freeman's ineffective assistance of counsel claim because he did not present the hearsay issue to the Court of Appeals, and (2) Freeman's sentencing claim because he did not appeal this issue to the Appellate Division.

By letter dated October 26, 2005, petitioner moved the Court to stay the petition in order to present and exhaust his claim for ineffective assistance of appellate counsel in state court. Judge Feuerstein granted the stay by Order dated December 6, 2005.

On March 10, 2006, the petition was reassigned to the undersigned. On June 22, 2006, pursuant to Freeman's request, the Court extended the stay in order to afford petitioner the opportunity to fully exhaust his claims.

### D. Further State Court Proceedings

### (1) Ineffective Assistance of Appellate Counsel Claim

On January 11, 2006, Freeman moved in a *coram nobis* application for the Appellate Division to vacate the July 2002 Order. However, rather than argue that his trial counsel had been ineffective – as he did on his first direct appeal and in the petition – Freeman argued that his appellate counsel was ineffective. Specifically, he argued that his appellate counsel represented him inadequately by failing to raise the hearsay issue to the Court of Appeals. (*See* Freeman's "Notice of Motion for Writ of Error Coram Nobis," at 1-2.) In his affidavit in support of his motion, he also argued that the trial court

erred in admitting prejudicial hearsay testimony. By Order dated July 11, 2006, the Appellate Division denied petitioner's request to vacate the July 2002 Order, stating that "[t]he appellant has failed to establish that he was denied the effective assistance of appellate counsel." *People v. Freeman*, 31 A.D.3d 577, 577 (N.Y. App. Div. 2006) (citations omitted).

On August 26, 2006, Freeman requested that the Court of Appeals grant him leave to appeal the Appellate Division's denial. Petitioner again argued that his appellate counsel had been ineffective. By Order dated November 15, 2006, the Court of Appeals denied petitioner leave to appeal. *People v. Freeman*, 7 N.Y.3d 901, 901 (N.Y. 2006).

### (2) Sentencing Claim

On May 23, 2006, petitioner requested that the trial court permit him to reargue his original motion to set aside his sentence pursuant to C.P.L. § 440.20.[9] By Order dated

_____

[9] Petitioner labeled his motion as one to renew, rather than one to reargue. However, the trial court deemed his motion as one to reargue, since it was based on the grounds that the trial court had "either inadvertently misinterpreted the claims as originally raised in [petitioner's] CPL § 440.20 motion, or applied the incorrect standard of law relative to the said claims advanced therein." (Order of the County Court, Nassau County, Indictment No. 98615-97, dated July 11, 2006.) Petitioner did not argue that there were new facts or a change in the law since the trial court's prior decision, as is required in a motion to renew. *See* N.Y. C.P.L.R. § 2221(e). Thus, contrary to petitioner's claim that he "filed a motion to renew, and not a motion to reargue" and so "it was improper for the court to convert the motion" (Supplemental Reply, dated Dec. 9, 2008), the court properly deemed petitioner's application as

July 11, 2006 (the "July 2006 Order"), the trial court denied petitioner's request on the basis that it was untimely. On July 28, 2006, Freeman applied for leave to appeal this denial to the New York State Supreme Court, Appellate Division. By Order dated February 13, 2007, the Appellate Division denied petitioner leave to appeal.

E. Further Proceedings Before the Court

By letter dated May 2, 2007, petitioner informed the Court that he had exhausted his claims in state court and was prepared to proceed with his petition.

On July 11, 2008, after receipt of petitioner's reply in support of his petition, the Court held a telephone conference with the petitioner and counsel for the respondent. At the conference, the Court deemed the initial petition to be amended to include the (now exhausted) ineffective assistance of appellate counsel claim contained in the reply. The Court then ordered supplemental briefing addressing (1) the procedural bars applicable to petitioner's claim of ineffective assistance of trial counsel and his challenge to the consecutive sentences, and (2) the merits of petitioner's claim of ineffective assistance of appellate counsel. Respondent and petitioner submitted their supplemental papers on September 3, 2008 and December 9, 2008, respectively. The Court has fully considered all of the submissions of the parties.

III. DISCUSSION

A. Standard of Review

To determine whether petitioner is entitled to a writ of *habeas corpus*, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2554. "Clearly established Federal law" is comprised of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the

_____

one for leave to reargue under New York law.

Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

AEDPA establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). The Second Circuit added that, while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Gilchrist*, 260 F.3d at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

### B. Procedural Bar

Respondent argues, as a threshold matter, that petitioner's ineffective assistance of trial counsel claim and his sentencing claim in the instant petition are procedurally barred, and that petitioner has failed to demonstrate any grounds to overcome this procedural bar. The Court agrees.

Before a federal court can consider a petition for a writ of *habeas corpus*, the petitioner must have exhausted all available state judicial remedies. 28 U.S.C. § 2254(b)(1); *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). Exhaustion of state remedies requires that a petitioner "'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" *Duncan*, 513 U.S. at 365 (additional quotation marks omitted) (quoting *Picard*, 404 U.S. at 275). "[I]t is not sufficient merely that the federal habeas applicant has been through the state courts." *Picard*, 404 U.S. at 275-76. To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see Duncan*, 513 U.S. at 365-66. "A petitioner has 'fairly presented' his claim only if he has 'informed the state court of both the factual and the legal premises of the claim he asserts in federal court.'" *Jones v. Keane*, 329 F.3d 290, 294-95 (2d Cir. 2003) (quoting *Dorsey v. Kelley*, 112 F.3d 50, 52 (2d Cir. 1997) (quoting *Daye v. Attorney Gen. of New York*, 696 F.2d 186, 191 (2d Cir. 1982))); *accord Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997) (quoting *Daye*, 696 F.2d at 191).

However, "it is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made."

*Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citing *Picard*, 404 U.S. at 277, and *Gayle v. Le Fevre*, 613 F.2d 21 (2d Cir. 1980)). State courts have been given a reasonable opportunity to pass on the federal *habeas* claim if the legal basis of the claim made in state court was the "substantial equivalent" of that of the *habeas* claim. *Picard*, 404 U.S. at 278; *accord Ulster County Court v. Allen*, 442 U.S. 140, 149 (1979); *Gayle*, 613 F.2d at 22 n.2; *United States ex rel. Gibbs v. Zelker*, 496 F.2d 991, 993-94 (2d Cir. 1974). "This means, in essence, that in state court the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Daye*, 696 F.2d at 192. "Specifically, [petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." *Daye*, 696 F.2d at 191-92 (citing *Picard*, 404 U.S. at 276 and *United States ex rel. Cleveland v. Casscles*, 479 F.2d 15, 19-20 (2d Cir. 1973)). "Likewise, the petitioner must have placed before the state court essentially the same legal doctrine he asserts in his federal petition." *Id.* at 192 (citing *Picard*, 404 U.S. at 276, *Callahan v. Le Fevre*, 605 F.2d 70, 72 (2d Cir. 1979), *Wilson v. Fogg*, 571 F.2d 91, 92-93 (2d Cir. 1978), and *Fielding v. Le Fevre*, 548 F.2d 1102, 1107 (2d Cir. 1977)). "The chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Id.* (footnote omitted).

Like the failure to exhaust a claim, the failure to satisfy the state's procedural requirements deprives the state courts of an opportunity to address the federal constitutional or statutory issues in a petitioner's claim. *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). "[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir. 1997) (quoting *Coleman*, 501 U.S. at 735) (additional citations omitted). Where the petitioner "can no longer obtain state-court review of his present claims on account of his procedural default, those claims are . . . to be deemed exhausted." *DiGuglielmo v. Smith*, 366 F.3d 130, 135 (2d Cir. 2004) (citing *Harris v. Reed*, 489 U.S. 255, 263 n.9 (1989) and *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991)). Therefore, for exhaustion purposes, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Keane*, 118 F.3d at 139 (quoting *Hoke*, 933 F.2d at 120 (quoting *Harris*, 489 U.S. at 263 n.9)). However, "exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (citing *Gray v. Netherland*, 518 U.S. 152, 161 (1996), and *Coleman*, 501 U.S. at 744-51). "[T]he procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Netherland*, 518 U.S. at 162 (citations omitted).

Although petitioner directly appealed to the Appellate Division with the same claim for ineffective assistance of trial counsel asserted in ground one of his *habeas* petition, petitioner raised a different claim in his appeal to the state's highest court. In his appeal to the New York Court of Appeals, petitioner claimed that his trial counsel was ineffective because counsel failed to address the illegality of the statement procured from the petitioner and changed strategy during the course of the trial. (*See* Respondent's Exh. 6.) Consequently, petitioner's current claim for ineffective assistance of trial counsel for failure to object to hearsay testimony is unexhausted, because he never squarely addressed this claim in his appeal to the New York Court of Appeals. In other words, the factual and legal bases asserted in ground one of Freeman's *habeas* petition have not been fairly presented to the State's highest court, notwithstanding the fact that the same general claim of ineffective assistance of counsel was brought before the Court of Appeals. *See, e.g.*, *Caballero v. Keane*, 42 F.3d 738, 741 (2d Cir. 1994) ("A claim of ineffective assistance can hinge on one allegation or, as here, the cumulative effect of several. Thus, without having been asked to consider the [new] drug-related allegation, the New York courts cannot be said to have had a fair opportunity to pass on this claim.") (internal citations omitted); *Cowan v. Artuz*, No. 95 Civ. 9967 (RPP) (THK), 1996 WL 631726, at *3 (S.D.N.Y. Oct. 24, 1996) ("Although petitioner did raise ineffective assistance of counsel claims in his two § 440.10 motions, those claims had different factual bases than significant portions of the claim raised in this proceeding."); *see also Jones v. Keane*, 329 F.3d 290, 295 (2003) (stating that the claims presented in petitioner's federal *habeas* petition must be the "substantial equivalent" of the claims raised in state court).

Petitioner's other *habeas* claim of improper sentencing was, at the time of Freeman's filing of the petition, similarly unexhausted in the state courts. Specifically, petitioner had presented his second claim for improper sentencing to the trial court in a motion pursuant to C.P.L. § 440.20, which was then denied on the merits. (*See* Respondent's Exh. 10.) However, according to the records of the Appellate Division, petitioner never sought from the court a leave to appeal the trial court's decision denying petitioner's motion.[10] At the time of the filing of the instant petition, petitioner's time to seek leave to appeal from the post-judgment motion had not expired.

While the proceedings in this action were stayed, however, petitioner still failed to exhaust the denial of his § 440.20 motion. On May 23, 2006, petitioner moved in the trial court to reargue the January 11, 2005 decision.[11] On July 11, 2006, the trial court denied petitioner's motion on the grounds that is was untimely.[12] Petitioner then sought leave to appeal this decision, which the Appellate Division denied. Because the trial

[10] As noted *supra*, although the Nassau County District Attorney's office received notice from the petitioner labeled "Notice of Entry," indicating petitioner's decision to appeal the trial court's decision, the Appellate Division never received a "Notice of Entry" that such application for leave to appeal would be made. (*See* Respondent's Exh. 11 (document titled "Notice of Entry").)

[11] As mentioned *supra*, although petitioner labeled his motion as one to renew, the Court properly deemed it as a motion for leave to reargue. *See* N.Y. C.P.L.R. § 2221(d).

[12] N.Y. C.P.L.R. § 2221(d)(3) requires that a motion to reargue be made within thirty days after service of a copy of the order determining the prior motion and written notice of its entry.

court's July 11, 2006 decision did not address the merits of petitioner's motion, the Appellate Division also did not reach the merits when it denied leave to appeal. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("[W]here, as here, the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits."). Although typically "claims raised in CPL motions are fully exhausted for purposes of 28 U.S.C. § 2254 where a party has sought leave to appeal the denial of the motion from the appropriate Appellate Division[,]" *Raymond v. David*, No. 04 Civ. 0796 (DNH), 2008 WL 2561997, at *3 (N.D.N.Y. June 24, 2008) (citations omitted), Freeman failed to appeal the denial of the C.P.L. § 440.20 motion and only attempted to appeal the denial of leave to reargue that decision.[13] Thus, his claim remained unexhausted. Petitioner's time to seek appellate review of the January 11, 2005 decision has now expired.

Because petitioner no longer has any state remedies available to him with respect to these claims, he meets the technical requirements for exhaustion. *Coleman*, 501 U.S. at 732. Thus, these claims are deemed exhausted under 28 U.S.C. § 2254(b) because petitioner no longer has any further remedies available in the New York state courts.

However, petitioner's claim of ineffective assistance of trial counsel is procedurally barred from appeal to New York's highest court, and his claim against consecutive sentences is procedurally barred from direct appeal to the New York Appellate Division. *See Bennett*, 353 F.3d at 139. Accordingly, the claims are also procedurally defaulted; where "'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' federal habeas courts also must deem the claims procedurally defaulted." *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (quoting *Coleman*, 501 U.S. at 735 n.1).

Once it is determined that a claim is procedurally barred under state rules, a federal court may still review such a claim on its merits if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Coleman*, 501 U.S. at 749-50 (citations omitted). A miscarriage of justice is demonstrated in extraordinary cases – for example, where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 495 (1986). Here, petitioner has not provided an explanation for his failure to raise these claims timely,[14] nor

---

[13] In fact, the Appellate Division may have denied petitioner's request for leave to appeal because it is unauthorized by statute. *See People v. Cooper*, 546 N.Y.S.2d 441, 441 (N.Y. App. Div. 1989); *People v. Armer*, 471 N.Y.S.2d 38, 38 (N.Y. App. Div. 1984); *see also People v. D'Amico*, 538 N.Y.S.2d 965, 966-67 (N.Y. App. Div. 1989) ("With respect to the People's motion to reargue and/or renew, such motion in a criminal case is not appealable[.]") (citations omitted).

[14] Petitioner cannot argue that his counsel's actions in not raising the hearsay issue to the Court of Appeals excuses his procedural default. (*See* Supplemental Reply, dated Dec. 9, 2008, at 3 ("[I]t would be repugnant to any fair sense of justice to suggest petitioner should be penalized for an act or omission by a trained professional lawyer, with years of experience[.]").) Because petitioner does not have a right to counsel on a

has he demonstrated that a fundamental miscarriage of justice would occur if these claims were not reviewed by the *habeas* court. Not only is petitioner's application devoid of any claim of actual innocence, but the evidence presented at trial clearly established petitioner's guilt beyond a reasonable doubt. Accordingly, petitioner has failed to present any circumstances to overcome the procedural bar that renders his claims exhausted but procedurally defaulted.

In sum, this Court finds that any independent claim with respect to ineffective assistance of trial counsel for failing to object to hearsay, as well as the sentencing claim, is procedurally barred and cannot form an independent basis for *habeas* relief. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999); *Jordan v. LeFevre*, 206 F.3 196, 198-99 (2d Cir. 2000); *Dorsey v. Kelly*, 112 F.3d at 52. Nevertheless, in an abundance of caution, this Court shall fully address the substance of petitioner's claims, and finds that they lack merit, as discussed *infra*.

---

discretionary appeal, a counsel's error during such an appeal cannot be considered cause to excuse a procedural default. *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991) ("Attorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error . . . . In the absence of a constitutional violation, the petitioner bears the risk in federal habeas for all attorney errors made in the course of the representation.") (internal citations and quotation marks omitted); *accord Hernandez v. Greiner*, 414 F.3d 266, 271 (2d Cir. 2005).

## C. Ineffective Assistance of Trial Counsel

In ground one of his petition, petitioner argues that he was denied his right to confront witnesses due to counsel's ineffective assistance at trial. Specifically, petitioner claims that trial counsel failed to object to alleged hearsay testimony given by four separate witnesses at trial – namely, Detectives Alger and Donnelly, Young, and Booker, regarding testimony about statements made to them by petitioner's co-defendant Thames – and that counsel's failure to protect petitioner's right to confront those witnesses resulted in prejudicial errors that altered the outcome of the trial. As set forth below, the Court agrees with the decision of the Appellate Division, which rejected this claim on the merits.[15]

---

[15] In his reply papers, petitioner made additional arguments regarding trial counsel's allegedly deficient performance. Specifically, petitioner contends that counsel asked confusing questions during voir dire to prospective jurors, "imprudently suggested to the jury that it may find that co-defendant and petitioner did, in fact, come back to Walker to engage in 'self-help' by trying to take back from the victim the money that the victim had taken from co-defendant," "gave an opening statement which was ill-conceived and ineptly developed, rambling and disconnected" and which failed to correctly frame the issues for the jury, and gave a deficient summation. (*See* Reply, dated Dec. 27, 2006, at 10-11.) These arguments are clearly unexhausted and procedurally barred from review, as they were not presented to the New York Court of Appeals in petitioner's application for leave to appeal. In any event, the Court has carefully reviewed the record from the trial and concludes that these arguments are without merit. An examination of the trial minutes reflects that defense counsel was a zealous advocate on petitioner's behalf and consistently argued that there were weaknesses in

Under the standard promulgated by *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694.

The first prong requires a showing that counsel's performance was deficient. However, constitutionally effective counsel embraces a "wide range of professionally competent assistance," and "counsel is strongly presumed to have rendered adequate

assistance and made all significant decisions in the exercise of reasonable professional judgment." *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of trial counsel's actions under all circumstances, keeping in mind that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Id.* at 689 (quoting *Rompilla v. Beard*, 545 U.S. 374, 408 (2005)). In assessing performance, a court must apply a "heavy measure of deference to counsel's judgments." *Greiner*, 417 F.3d at 319 (quoting *Strickland*, 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision," *DeLuca v. Lord*, 77 F.3d 578, 588 n.3 (2d Cir. 1996), and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* (citing *Strickland*, 466 U.S. at 690-91). Moreover, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.*

The second prong focuses on prejudice to the petitioner. The petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, "reasonable probability" means that the errors were of a magnitude such that they "undermine[] confidence in the outcome." *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). "The question to be asked in assessing the prejudice from counsel's errors

---

the State's case against petitioner. Counsel also sufficiently demonstrated familiarity with the relevant facts and legal principles relating to petitioner's case. *See United States v. DiPaola*, 804 U.S. F.2d 225, 234 (2d Cir. 1986). More specifically, petitioner's counsel performed reasonable and effective assistance during trial, including the delivery of a persuasive opening (Tr. 704-16) and closing argument (Tr. 1456-1510), voir dire of jurors (Tr. 106-30, 212-33, 336-70, 450-81, 532-39, 634-56), and presentation of a logical defense in light of the People's evidence. (Tr. 1282-94, 1442.) In addition, counsel obtained an acquittal on two of the three counts of murder against the petitioner. (Tr. 1658.) Petitioner's counsel also received praise from the trial judge, who stated at the end of the trial, "I want to commend both counsel for the very professional manner in which they conducted themselves throughout the trial." (Tr. 1662.) Accordingly, the Court is not persuaded that counsel's representation was professionally unreasonable. Furthermore, given the overwhelming weight of evidence against petitioner, there is certainly no reasonable probability that, but for these alleged errors, taken individually or cumulatively, the outcome of the trial would have been different.

. . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695).

Here, petitioner's claim fails to satisfy the first prong of *Strickland*. As an initial matter, to the extent that petitioner claims that the testimony of Detectives Donnelly and Alger – stating that, prior to obtaining petitioner's confession, they confronted him with co-defendant Thames's incriminating statement and revealing the contents of such statement – constituted inadmissible hearsay, the Court disagrees. Such testimony was proper under New York law, since it was introduced for the non-hearsay purpose of rebutting petitioner's challenge to the voluntariness of his confession. In New York, "[t]he burden is upon the People to establish voluntariness and, in the absence of circumstances involving physical force, voluntariness may best be determined through an examination of the totality of the circumstances surrounding the confession." *People v. Glover*, 195 A.D.2d 999, 999 (N.Y. App. Div. 1993) (internal quotation marks and citation omitted). As in *Glover*, the testimony here was "not hearsay because the testimony was not offered for its truth, but to establish the circumstances in which the statement was obtained, and to rebut defendant's argument that the officer coerced or fabricated defendant's statement." *Id.*; *see also Tennessee v. Street*, 471 U.S. 409, 414 (1985) (holding that it was proper to introduce an accomplice's confession for the non-hearsay purpose of rebutting defendant's testimony that his own confession was coercively derived from accomplice's statement and stating, "[t]he nonhearsay aspect of Peele's confession – not to prove what happened at the murder scene but to prove what happened

when respondent confessed – raises no Confrontation Clause concerns."); *People v. Lewis*, 11 A.D.3d 954, 955 (N.Y. App. Div. 2004) ("Contrary to defendant's contention in appeal No. 2, County Court properly allowed two officers to testify that they had informed defendant during interrogation that his co-defendant had implicated him in the crimes and that there were witnesses who had identified him at the crime scene. Although the co-defendant's statement to the officers was testimonial, it was not offered for the truth of the facts asserted therein, but was instead offered to set forth the circumstances in which defendant admitted his culpability after initially denying all involvement in the crimes[.]") (internal citations omitted).

In this case, the detectives' testimony about Thames's statements inculpating petitioner was proper, since the voluntariness of petitioner's confession was put at issue by the petitioner. Petitioner had initially denied culpability in the murder to the police (and, on the witness stand, claimed the confession was false and involuntary), and thus the circumstances surrounding his confession were particularly relevant. In fact, the record reflects that this was the prosecution's intent in eliciting this testimony and why the court permitted the testimony:

> The People: The reason I brought out the statements of Thames to Alger, was because I think it does go to voluntariness . . . . I am allowed to elicit testimony of what a codefendant says to show –
> . . .
> The Court: where there is a change in the statement.

15

(T.1061-62.) Thus, the record supports the conclusion that such testimony was properly admitted.

However, even assuming for the purposes of this analysis that the testimony of Young, Booker and Detectives Donnelly and Alger (regarding statements that had allegedly been made by non-testifying co-defendant Thames) constituted inadmissable hearsay, the conduct of defense counsel in failing to object to the admission of these statements during trial, taken individually or cumulatively, does not rise to the level of constitutionally ineffective assistance of counsel. This is because "[a]ctions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance of counsel." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 689). In this case, trial counsel's alleged failure to object may be considered a part of a sound defense strategy, as set forth below.

Specifically, petitioner's counsel's decision to refrain from objecting to the hearsay testimony of Donnelly and Alger, regarding statements made by Thames to detectives, may have been part of counsel's strategy to suggest that Thames was trying to blame Freeman for the murder that in fact Thames had committed. Police initially questioned Thames's involvement in the murder of Walker. (T.1005, 1153-54.) When Thames was questioned later a second time, he changed his previous statements to the police and stated that Freeman had shot Walker. (T.1021, 1156.) Thames also told the police that he thought Walker was going to grab petitioner and the gun. (T.1133.) The fact that Thames changed his statements after being questioned by police was used by defense counsel to support the defense theory that Thames, an unreliable and self-interested

source, was attempting to exculpate himself from the murder charges by blaming petitioner for the shooting. Indeed, counsel's intentions are revealed by his statement to the court that, "I *purposely* did not object on [Alger's] direct regarding what Thames said when I certainly could have . . . . I think it goes to Mr. Thames['s] motive to lie to say that my guy is the shooter." (T.1060-61) (emphasis added.) Counsel further suggested through his questioning of the detectives that Young and Thames, after initially lying to the police about their knowledge of Walker's death, together concocted a story that blamed petitioner for killing Walker and protected Thames. (T.1055-57, 1155-57, 1166-67, 1181.)

Counsel further pursued this strategy during Young's testimony. The hearsay testimony elicited from Young was likely intended to demonstrate that both co-defendant Thames and his girlfriend, Young, plotted to inculpate the petitioner and exculpate Thames from the murder charges. With respect to the disputed testimony, petitioner claims that Young testified that, prior to the shooting, Thames had stated that Freeman would help him get his money back. Young also testified that Thames said to petitioner, after the shooting, that he thought Walker was going to grab petitioner and the gun. (T.932-33.) First, the pages cited by petitioner (T.925-26) as reflecting Young's testimony that Thames had said Freeman would help Thames get his money back do not support his assertion; rather, that testimony indicates that Thames told Young that he, Thames, wanted to get his money back and that petitioner – not Thames – said that petitioner was going to help Thames get his money back. In any event, Young had also been questioned on two occasions prior to petitioner's arrest and changed her story

between those two occasions; moreover, she had a possible motive to lie to avoid prosecution herself and to assist her boyfriend, Thames. Counsel's questioning of Young reflected the defense strategy of highlighting Young's potential bias and the opportunity that she and Thames had to coordinate their stories, which both changed between their first and second sessions with the police. (T.979-83.) Even petitioner acknowledges that "defense counsel had tried to suggest to the jury, during his cross-examination of Young and of Det. Donnelly, that Young had a motivation to testify falsely against petitioner in order to avoid being prosecuted as an accessory to the felony murder[.]" (Reply, dated Dec. 27, 2006, at 13.)

Similarly, counsel's failure to object to hearsay testimony during Booker's direct examination may have been intended to show Thames's efforts at inculpating defendant. Booker testified that Thames said "Baby," a "cousin" of Thames, would "shoot people out in Brooklyn." (T.829.) However, these statements – made by someone who was presumably biased in favor of Thames (who sold drugs on Booker's behalf), regarding uncharged and uncorroborated shootings by "Baby" – may have also supported a defense theory that such uncorroborated and unreliable testimony was presented to inculpate Freeman and portray him in a negative light.[16]

Another possible strategy pursued by counsel may have been to show that the police pre-judged the case based upon Thames's unreliable and self-interested statements and thereby presumed petitioner's guilt. This angle is also supported by counsel's questioning of Alger and Donnelly. (T.1057-59, 1064-66, 1156-57, 1164-65.) Petitioner's argument during trial that his confession was not accurate and obtained through deceit is also consistent with this defense theory. In any event, both plausible defense theories aimed to cast doubt on the veracity of the potentially biased prosecution witnesses' testimony, petitioner's confession, and the thoroughness of the police investigation. Thus, trial counsel's decision not to object to the testimony at issue was conceivably part of a sound and strategic defense in light of the prosecution's evidence. Accordingly, there is no basis in petitioner's arguments, which essentially boil down to his objections to trial counsel's strategy, for concluding that counsel's representation fell below an objective standard of reasonableness. *See, e.g., Singleton v. Duncan*, No. 03 Civ. 561 (ARR), 2006 WL 73734, at *14 (E.D.N.Y. Jan. 10, 2006) (holding simple disagreements over trial strategies or tactics, alone, do not merit ineffective counsel); *cf., e.g., Henry v.*

---

[16] The Court also notes that counsel did initially object to Booker's hearsay testimony regarding Thames's conversations with Booker, and this objection was overruled by the trial court. (T.800.) Defense counsel further made clear that he had a continuing objection to such questions posed to Booker "throughout the trial," to which the trial court responded, "[m]y ruling is the same

as to each one of those actions." (T.800-01.) Regardless of whether such objections applied to the specific testimony that petitioner now complains of – since petitioner argues that counsel then explicitly stated, "[Booker] can answer, I have no problem with that, let him answer," to Booker's statement that Thames "[u]sed to talk about how [Baby] shoot people out in Brooklyn" (T.829) – the Court finds that counsel's decision to permit such testimony may be explained by strategic choice and, at the very least, counsel's initial objections indicate his awareness of the hearsay issue and its potential prejudice to his client.

*Scully*, 261 F.3d 210, 218 (2d Cir. 1996) (affirming district court's finding of ineffective assistance of trial counsel where counsel's failure to object to inadmissable testimony was an *inconceivably incomprehensive* defense strategy) (emphasis added). In short, based upon the Court's careful review of the record, it is clear that there is no basis to conclude that the performance of trial counsel, with respect to the hearsay issues or any other issues, fell below an objective standard of reasonableness.

Nonetheless, even assuming *arguendo* that trial counsel's performance was constitutionally defective, petitioner's claim would still fail because he has not demonstrated prejudice, as required by the second prong of the *Strickland* test. In light of the prosecution's overwhelming evidence against petitioner, the admission of the hearsay testimony at issue did not create a reasonable probability that but for counsel's failure to object, the trial verdict would have been different. The prosecution presented a compelling case with substantial evidence against petitioner at trial including: (1) testimony from two eyewitnesses placing either petitioner or a man of petitioner's height and stature at the scene of the crime, (2) testimony from three additional witnesses who corroborated certain portions of Young's account, (3) evidence found at petitioner's home that included the same kind of cartridge found at the crime scene, as well as a green hooded sweatshirt matching eyewitness testimony describing the shooter, (4) a substance that resembled blood and was found to contain mixed human DNA on petitioner's jeans, and (5) a written and signed detailed confession by the petitioner, which was also substantially corroborated by witness testimony. (Tr. 751-52, 871-72, 905-07, 925-

30, 945-46, 972-975, 1218, 1234, 1316-18.) Consequently, this Court concludes that, given the overwhelming evidence presented by the prosecution at trial, there is no reasonable probability that the verdict at trial would have been different had petitioner's counsel successfully objected to the alleged hearsay testimony. *See Rodriguez v. Senkowski*, No. 03 Civ. 3314 (AJP), 2004 WL 503451, at *41 (S.D.N.Y. Mar. 15, 2004) ("[I]n light of the extremely strong evidence against [petitioner], any deficiency of counsel still would not satisfy the second *Strickland* prong, of showing that [petitioner] was prejudiced."); *see also Kanani v. Phillips*, No. 03 Civ. 2534 (AJP), 2004 WL 2296128, at *32 (S.D.N.Y. Oct. 13, 2004). ("Due to the overwhelming evidence of [the petitioner's] guilt, it is unlikely that additional investigation would have affected the outcome of the trial.").

Accordingly, the state court's holding rejecting petitioner's claim on the merits was not an unreasonable application of, or contrary to, clearly established federal law. Thus, Freeman's request for *habeas* relief on grounds of ineffective assistance of trial counsel is denied.

D. Consecutive Sentences

Freeman next contends that it was improper for the trial court to have ordered the sentence for his third-degree weapon possession conviction to run consecutively to the other sentences. Specifically, he argues that because the crime of weapon possession in the third degree "flowed from the same incident" as the other crimes of which he was convicted (Reply, dated Dec. 27, 2006, at 16), it was improper for the trial court to deem the criminal weapon possession to be a separate and distinct count. Although this

claim is procedurally barred, as discussed *supra*, the Court also rejects this claim on the merits.

First, to the extent that petitioner argues that his sentence was in violation of New York law, Freeman does not present a federal claim that this Court may properly review. Issues regarding sentencing under state statutes are not federal claims, and thus are not cognizable under federal *habeas* review. *See, e.g.*, *Lopez v. Goord*, No. 05 Civ. 5855 (AKH), 2008 WL 3158447, at \*4 (S.D.N.Y. Aug. 5, 2008) ("[I]t is purely a matter of state law how a prison term should be served, whether concurrent or consecutive[.]"); *Davis v. Herbert*, No. 02 Civ. 04908 (JBW), 2003 U.S. Dist. LEXIS 24121, at \*45 (E.D.N.Y. Nov. 13, 2003) ("Whether the sentence could be consecutive was a matter of state law and raises no Constitutional issue."). As for a possible federal claim, "no constitutional issue is presented where a sentence falls within the range proscribed by state statutory law." *Chisholm v. Henderson*, 736 F. Supp. 444, 449 (E.D.N.Y. 1990); *see Ashby v. Senkowski*, 269 F. Supp. 2d 109, 115 (E.D.N.Y. 2003) ("A challenge to the imposition of consecutive sentences fails to present an issue of constitutional dimension if the sentence falls within the range prescribed by state law."); *see also United States v. Wiley*, 519 F.2d 1348, 1351 (2d Cir. 1975), *cert. denied sub nom. James v. United States*, 423 U.S. 1058 (1976) ("The appellant Wiley has attacked the length and nature of her sentence, but there are no circumstances in connection with it which would justify any consideration of it by this court. It was well within the statutory limits and was fixed within the sound judgment of the district court."); *Herrera v. Artuz*, 171 F. Supp. 2d 146, 151 (S.D.N.Y. 2001) ("It is well settled that when a sentence is in accord with the range established by state statutory law there is no constitutional issue presented for habeas review.") (citing *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992)); *Rivera v. Quick*, 571 F. Supp. 1247, 1248-49 (S.D.N.Y. 1983) (because petitioner's sentence was within the range permitted by state law, its length did not present a constitutional issue); *Reese v. Bara*, 479 F. Supp. 651, 657 (S.D.N.Y. 1979) (finding no constitutional issue where sentence was imposed within statutory bounds).

Here, Freeman's sentence fell within the range prescribed by New York Penal Law §§ 70.00, 70.02. Moreover, the consecutive sentence imposed was completely consistent with New York law. Specifically, under New York law, the trial court had the discretion to impose consecutive sentences for acts proven to be separate and distinct, including acts of murder and criminal possession of a weapon. *See* N.Y. Penal Law § 70.25(2); *People v. Arroyo*, 717 N.E.2d 696 (N.Y. 1999); *People v. Rouse*, N.Y.S.2d 579 (N.Y. App. Div. 2004). The Court of Appeals has set forth the following guidance on whether concurrent sentences are required:

> In determining whether concurrent sentences are required, the sentencing court must first examine the statutory definitions of the crimes for which defendant has been convicted. Because both prongs of Penal Law § 70.25(2) refer to the "act or omission," that is, the "actus reus" that constitutes the offense, the court must determine whether the actus reus element is, by definition, the same for both offenses (under the first prong of the

statute), or if the actus reus for one offense is, by definition, a material element of the second offense (under the second prong). If it is neither, then the People have satisfied their obligation of showing that concurrent sentences are not required. If the statutory elements do overlap under either prong of the statute, the People may yet establish the legality of consecutive sentencing by showing that the "acts or omissions" committed by defendant were separate and distinct acts (citations omitted).

*People v. Laureano*, 87 N.Y.2d 640, 643 (1996).

In this case, the third degree gun possession was separate and distinct from the second degree possession, attempted robbery, and murder of the victim. First, third degree possession, unlike second degree possession, does not require the intent to use the weapon against another. *See, e.g., People v. Okafore*, 72 N.Y.2d 81, 88-89 (N.Y. 1988). Further, "[t]he crime of illegal possession of a weapon is not to be confused with the use which is ultimately made of that weapon." *People v. Abdul-Hakeem*, 172 A.D.2d 177, 177 (N.Y. App. Div. 1991). Indeed, "[o]nce the unlawful possession of the weapon is established, the possessory crime is complete and any unlawful use of the weapon is punishable as a separate crime." *People v. Almodovar*, 62 N.Y.2d 126, 130 (N.Y. 1984).

Contrary to petitioner's assertion that the evidence failed to establish conclusively that petitioner was in possession of any weapon prior to the commission of the crime (Reply, dated Dec. 27, 2006, at 15), there was ample evidence proffered by the prosecution that Freeman unlawfully possessed the gun that was used to shoot Walker, prior to its use in the confrontation with the victim. Specifically, petitioner's confession stated that, "I walked away and went into the store to see my cousin Eddie. I asked him for a gun and he gave me one." (T.1030.) He further testified at trial that he borrowed a gun from "Eddie" and gave it to Thames, after Thames requested a gun from him. (T.1302-24.) As soon as petitioner received the loaded gun from Eddie, outside his home or place of business, the crime of possession of a weapon in the third degree was complete. *See* N.Y. P.L. § 265.02(4) (repealed 2006); *People v. Salcedo*, 92 N.Y.2d 1019 (1998). Petitioner's confession also indicated that Freeman retook possession of the gun from Thames at the time of the attempted robbery and murder. Not only was the initial gun possession separated by time and place from the subsequent murder and attempted robbery, defendant testified that at the time of his initial possession of the gun, he was unaware that a robbery had been planned or that a murder was intended. (T.1442.)

Finally, and also contrary to petitioner's assertions, the indictment's statement that "[a]ll of the actions and transactions alleged in each of the several counts of this indictment are connected together and form part of a common scheme or plan," does not defeat the possibility of consecutive sentences, because separate and distinct acts may occur within one continuous incident. *See People v. Brathwaite*, 63 N.Y.2d 839, 843 (N.Y. 1984) (upholding consecutive sentences for convictions of two counts of felony murder and reasoning that "although the two deaths may be said to have occurred in the course of

a single extended transaction – the robbery – it was separate 'acts' which caused the deaths of the owner and the clerk[.]"); *cf. People v. Rodriguez*, 49 A.D.3d 433, 435 (N.Y. App. Div. 2008) ("The court properly imposed consecutive sentences for the five sexual offenses because they were separate and distinct acts, notwithstanding that they occurred in the course of a continuous incident. Each of the sex crimes was a separate 'act' within the meaning of Penal Law § 15.00(1) and § 70.25(2), and nothing in the Penal Law requires any type of interval or interruption in a continuous attack in order for the individual acts to qualify as separate for sentencing purposes[.]") (additional quotation marks and citation omitted). The prosecution's theory, therefore, that the charges against the petitioner all arose from the same scheme, implemented on the night of the crime, is not inconsistent with its position that the third degree gun possession is a separate count for sentencing purposes. Thus, the imposition of a consecutive sentence with respect to the third degree possession charge was properly within the sentencing court's discretion under New York law. Indeed, New York courts regularly impose such consecutive sentences in similar situations. *See, e.g., People v. Simpson*, 209 A.D.2d 281, 282 (N.Y. App. Div. 1994) (upholding consecutive sentences for first-degree manslaughter and criminal possession of a weapon in the second and third degrees where defendant placed a gun in his pants in an apartment and then went downstairs to speak with victim and shot him); *People v. Bernier*, 204 A.D.2d 732, 733 (N.Y. App. Div. 1994) (upholding consecutive sentences where a security guard at a nightclub used a gun to push away a crowd and then accidentally pulled the trigger and stating, "[t]he crimes of criminally negligent homicide and criminal possession of a weapon in the third degree

were not committed in a single act."); *People v. Davis*, 174 A.D.2d 369, 370 (N.Y. App. Div. 1991) (upholding consecutive sentences where defendant grabbed a gun in his apartment and then confronted a security guard, whom he shot).

In sum, because petitioner's total punishment did not exceed the limits as set forth by the New York legislature, no constitutional violation is at issue. More specifically, the imposed sentences do not violate the double jeopardy clause's protection against "multiple punishments for the same offense imposed in a single proceeding," *Jones v. Thomas*, 491 U.S. 376, 381 (1989), nor do they contravene the Eighth Amendment's prohibition on cruel and unusual punishment in light of the grave nature of the offenses and the legal validity of the sentences. *See Campbell v. Poole*, 555 F. Supp. 2d 345, 377 (W.D.N.Y. 2008) ("[I]t is well-established that a sentence of imprisonment that is within the limits of a valid state statute is not cruel and unusual punishment in the constitutional sense."). Moreover, petitioner has failed to show an "extraordinary set of circumstances that renders the imposition of consecutive sentences unconstitutional." *United States v. Jaramillo-Montoya*, 834 F.2d 276, 279 (2d Cir. 1987) (internal quotation marks and citation omitted). Accordingly, the consecutive sentences were authorized by state law and did not result in any unconstitutional deprivation of the petitioner's liberty, and *habeas* relief is denied on the sentencing claim.

E. Ineffective Assistance of Appellate Counsel

Petitioner also brings a claim of ineffective assistance of appellate counsel.

Although this claim was not a part of Freeman's initial petition and was presented in his reply papers, petitioner did request a stay of the *habeas* proceedings while he exhausted this claim in state court. After he exhausted this claim, the Court deemed the petition to be amended to include this claim. Thus, the Court reviews this claim, which was the subject of supplemental briefing, on the merits and rejects it as a basis for *habeas* relief in this case for the reasons discussed below.

A criminal defendant has the right to the effective assistance of counsel on the direct appeal of his conviction. *See Evitts v. Lucey*, 469 U.S. 387, 395-96 (1985). In determining whether appellate counsel has rendered constitutionally effective assistance, courts will apply the standard for analyzing such claims as to trial counsel, established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *See, e.g., Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citing *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992)).

The Appellate Division rejected petitioner's claim of ineffective assistance of appellate counsel on the merits. *See People v. Freeman*, 31 A.D.3d 577, 577 (N.Y. App. Div. 2006). The Court concludes that the Appellate Division's decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law. As a threshold matter, to the extent that petitioner's claim relies upon his appellate counsel's alleged failure to raise certain claims to the New York Court of Appeals, it fails because petitioner is only entitled to constitutionally effective assistance on the first direct appeal of his conviction to the New York Appellate Division. *See Wainwright v. Torna*, 455 U.S. 586, 587-88 (1982)

("Respondent does not contest the finding of the District Court that he had no absolute right to appeal his convictions to the Florida Supreme Court. Since respondent had no constitutional right to counsel, he could not be deprived of the effective assistance of counsel by his retained counsel's failure to file the application timely.").

Even assuming *arguendo*, however, that petitioner did have a constitutional right to effective appellate counsel in the appeal at issue, his claim would still fail. Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Jones*, 463 U.S. at 750-54 (1983)); *see also Strickland*, 466 U.S. at 690-91 (noting that appellate counsel's strategic choices with regard to which claims to bring on appeal are "virtually unchallengeable"). As the Supreme Court has noted, "[t]his process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones*, 463 U.S. at 751-52); *accord Sellan v. Kuhlman*, 261 F.3d 303, 317 (2d Cir. 2001). Thus, reviewing courts should not "second-guess" the reasonable professional judgments of appellate counsel as to the most promising appeal issues. *Jones*, 463 U.S. 745; *accord Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998). Instead, as the Second Circuit has instructed:

> [T]he district court must examine the trial court record to determine whether appellate counsel failed to present significant and obvious issues

on appeal. Significant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of counsel be overcome.

*Mayo*, 13 F.3d at 533 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985)).

In the instant case, petitioner argues that appellate counsel failed to raise the hearsay issue that was brought on direct appeal but not on subsequent appeal to the New York Court of Appeals. However, petitioner's claim of ineffective assistance of trial counsel, based on the alleged failure to object to certain hearsay testimony during trial, is plainly without merit, as discussed *supra* and as determined on the merits by the Appellate Division. Thus, it was not objectively unreasonable for appellate counsel to fail to further argue this claim, in light of its obvious weakness.

In support of his claim, petitioner argues that appellate counsel had filed a 63-page brief on the issue on direct appeal, as well as a 35-page reply brief, and thus counsel's failure to assert the same claim to the Court of Appeals was "incredible." (Petitioner's Reply, dated Dec. 26, 2006, at 19.) However, this description is not accurate to the extent that it attributes the entirety of the contents of the appellate briefs to the hearsay issue, because appellate counsel brought several claims on behalf of petitioner on direct appeal. More importantly, the fact that appellate counsel so thoroughly argued the law and facts of the case with respect to the hearsay

issue strongly suggests that counsel's decision not to pursue the claim further was based on strategic choice after a thorough investigation of the law and facts, which is "virtually unchallengeable." *Strickland*, 466 U.S. at 690. Such an omission by counsel does not overcome the presumption that her actions fall within the wide range of reasonable professional assistance. *Id.* at 689.

Furthermore, even assuming *arguendo* that counsel's omission was an exercise of unreasonable professional judgment, petitioner fails to satisfy the second prong of the *Strickland* standard. Here, petitioner has failed to show that there was a reasonable probability that his appeal would have been successful absent appellate counsel's alleged deficient performance. For the reasons discussed *supra*, there is no basis to conclude that the underlying ineffective assistance of trial counsel claim, based on the alleged failure to object to certain hearsay testimony, would have succeeded if it were raised, given the high legal standard for ineffective assistance of trial counsel and the lack of support in the record for petitioner's claim. In fact, this Court has reviewed petitioner's claim on the merits, and agrees with the Appellate Division's determination that petitioner failed to establish any violation of his constitutional right to effective trial counsel. Accordingly, because petitioner has not shown prejudice resulting from appellate counsel's actions, his claim for ineffective assistance of appellate counsel is also rejected under the *Strickland* standard.

IV. CONCLUSION

For the foregoing reasons, Freeman's petition for a writ of *habeas corpus* is denied. The two claims raised in the initial petition are procedurally defaulted and without merit, and

petitioner's additional claim, raised in his reply papers and exhausted in state court while his petition was pending before the Court, is also without merit. Petitioner has failed to point to any state court ruling that is contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

Because petitioner failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: May 22, 2009
Central Islip, New York

* * *

Petitioner appears *pro se*. The attorneys for respondent are Tammy J. Smiley and Andrea M. DiGregorio, Assistant District Attorneys, Office of the District Attorney, Nassau County, 262 Old Country Road, Mineola, NY 11501.